IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| CEDRIC DEWAYNE THOMPSON | § | |
| v. | § | CIVIL ACTION NO. 6:22cv124 |
| DIRECTOR, TDCJ-CID | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

The Petitioner Cedric Thompson, a prisoner of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this petition for the writ of habeas corpus under 28 U.S.C. §2254 complaining of the legality of his conviction. The petition has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b)(1) and (3) and Local Rule CV-72 of the Local Rules of Court for the Eastern District of Texas.

**I. Procedural Background**

Petitioner was arrested and charged with the murder of his wife Kayla in April of 2014. In July of 2016, he was found incompetent to stand trial. His competency was restored in September of 2017, and in April of 2018, he filed a motion to dismiss the indictment as a violation of his right to a speedy trial. A hearing was conducted and it was revealed that the State was awaiting DNA results which were submitted for testing some four years after Petitioner's arrest. The motion to dismiss the indictment was denied.

Petitioner later pleaded guilty and asked that the trial court assess punishment, but subsequently withdrew the guilty plea and proceeded to a jury trial. The jury found him guilty on July 24, 2019, and sentenced him to life in prison.

Petitioner's conviction was affirmed by the Twelfth Judicial District Court of Appeals on April 14, 2021, and the Texas Court of Criminal Appeals refused his petition for discretionary

review. *Thompson v. State*, slip op. no. 12-19-00268-CR, 2021 WL 1418402 (Tex.App.-Tyler, April 14, 2021, review refused September 22, 2021). Petitioner subsequently filed a state habeas corpus petition, which was denied without written order by the Texas Court of Criminal Appeals on January 19, 2022. He then filed this petition for federal habeas corpus relief.

## II. The Facts of the Case

According to Petitioner's appellate brief, he and his wife Kayla had an argument on April 19, 2014.  Their 10-year-old daughter heard them arguing and heard her mother say that Petitioner had hit her in the head and that he is going to jail.  In an interview with law enforcement, Petitioner said that the argument concerned Kayla cheating on him with another man.

Petitioner testified at trial that he left the house while Kayla was still alive. Upon leaving, he attempted suicide twice, one by taking pills and once by throwing himself out of his aunt and uncle's car while it was moving.

On April 20, 2014, Kayla's mother Judith Wood received a Facebook message and called a member of Petitioner's family. She learned that Petitioner was in the hospital in Kilgore after a suicide attempt. Wood went to Kayla's house and discovered Kayla's body in the driveway. She went in the house and discovered the children in the house, barricaded in their room.

Detective Joey Ray testified that he discovered shoe prints around Kayla's body and blood on the porch and doorknob as well as inside the home.  Petitioner was arrested that same day, April 20, 2014. He waived his *Miranda* rights and was interviewed by an investigator named Randy Hatch. During this interview, Petitioner denied killing Kayla and said that she was alive when he left the house.

The evidence showed that Kayla had been stabbed multiple times and run over with a vehicle. Blood was found inside the house, on the porch, in the driveway, and on Kayla's Trailblazer, which was seized by police in Marshall.

**III. Petitioner's State Proceedings**

In his direct appeal, Petitioner asserted that there was no evidence to support the jury's negative finding on sudden passion. The Twelfth Court of Appeals observed that during Petitioner's interview with Hatch, he repeatedly denied being angry or upset, although he said once that he was "mad, just like any other man would be mad." The Court of Appeals concluded that there was sufficient evidence negating Petitioner's sudden passion argument, including his denial in the interview, his denial at trial that he had killed Kayla at all, the fact that he had learned about Kayla's affair days before the altercation and her death, and the daughter's testimony that the argument on April 19 had occurred over an extended period of time and that Petitioner was calm and collected.

Petitioner next contended that he was improperly denied a speedy trial. The Court of Appeals reviewed the reasons for the delay, which included four resets attributable to Petitioner and one attributable to the court, and also a delay attributable to negligence on the part of the State in not submitting the DNA samples to the Texas Department of Public Safety. The court reviewed and balanced the factors of *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) and concluded that based upon the entirety of the record, the factors weighed against Petitioner.

Finally, Plaintiff contended that his Confrontation Clause right to confront the author of the autopsy report was violated because a different medical examiner, Dr. Gwin, testified as to the contents of the report even though Dr. Quinton had created the report. The Court of Appeals concluded that Petitioner had failed to preserve this ground because he objected based on lack of personal knowledge rather than a Confrontation Clause violation.

Petitioner's petition for discretionary review raised only his Confrontation Clause claim, arguing that his objection at trial was sufficient to preserve error and that his right to confront the author of the autopsy report was violated because a surrogate witness was used to justify the testimonial hearsay in the report. (Docket no. 15-51, p. 3).

In his state habeas petition, Petitioner argued that: (1) his conviction was illegal because the deadly weapon finding was removed by a *nunc pro tunc* order; (2) counsel's objection to the

pathologist's report amounted to a Confrontation Clause objection and the witness' testimony was hearsay; (3) Petitioner's lawyer argued that the testimony of the original pathologist, Dr. Quinton, was necessary to preserve Petitioner's Sixth Amendment rights; (4) Dr. Gwin lacked personal knowledge of the report other than from looking at photographs; and (5) counsel failed to secure a second mental competency exam. (Docket no. 15-56, 15-57). This petition was denied without written order by the Texas Court of Criminal Appeals on January 19, 2022.

**IV. The Federal Habeas Corpus Petition**

In his federal habeas petition, Petitioner argues that: (1) his rights under the Confrontation Clause were violated because the State put on the testimony of Dr. Gwin, who was only the custodian of the records and did not create or author the autopsy report; (2) Petitioner's right to a speedy trial was violated; (3) the evidence showed that Petitioner acted under the influence of sudden passion because the facts were presented showing an affair between Kayla Thompson and an individual named Benjamin Finley; and (4) the deadly weapon finding was removed by the judge - which Petitioner says is grounds for an acquittal, the State sold Kayla's Trailblazer, the vehicle with which Petitioner allegedly ran over Kayla, and counsel failed to move for dismissal on the basis that the DNA evidence did not prove murder.

The Respondent has filed an answer arguing that Petitioner failed to show that the state courts' rejection of his claims was objectively unreasonable and that his grounds 2, 3, and 4 are unexhausted and thus procedurally defaulted.

Petitioner has filed a response conceding that his grounds 2 and 3 are unexhausted. He contends that his fourth ground for relief did not exist until after his direct appeal was concluded but that he presented it in ground 1 of his state habeas petition, so it was exhausted.

Petitioner states in his response that on July 12, 2019, counsel filed an amended motion concerning the witness' pathology testimony. The trial court held a hearing on this motion and denied it. At trial, counsel objected to the Sixth Amendment violation.

Petitioner argues that the trial court infrinoed his Sixth Amendment rights, saying that the motion was actually denied the day before the hearing and the court cut off counsel in the middle of his objection. He says that the trial court and the Court of Appeals knew what was being objected to (i.e. that counsel was raising a Confrontation Clause objection) but the appellate court ruled contrary to clearly established federal law.

According to Petitioner, the Supreme Court has held that the testimonial statement of one witness will not be allowed into evidence through the in-court testimony of a second, citing *Davis v. Washington*, 547 U.S. 813, 826 (2006). Thus, he contends that the analysts who write reports which the prosecution introduces must be made available for confrontation "even if they possess the scientific acumen of Mme. Curie and the veracity of Mother Teresa," citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 319 n. 6 (2009). Because he did raise a proper objection concerning the Confrontation Clause, Petitioner argues that the Texas state courts ruled in violation of the Constitution.

**V. Discussion**

A. The Confrontation Clause Claim

In his first ground for relief, Petitioner asserts that his right to confront Dr. Quinton, the doctor who performed the autopsy, was violated when the State put on Dr. Chester Gwin, a medical examiner from the Southwestern Institute of Forensic Sciences. Petitioner contends that Dr. Gwin was only the custodian of the records and did not create or author the autopsy report.

A hearing was conducted on Petitioner's motion on witness pathologist testimony on July 12, 2019 (docket no. 12-16, p. 4).[1] At this hearing, Plaintiff's counsel Clay Thomas argued that he had made a motion against the substitution of the medical examiner, saying that the State was proposing to have Dr. Gwin testify in place of Dr. Quinton. Thomas stated that "from everything

---

[1] The index of the Clerk's record does not show the motion itself, nor does a copy of a written motion opposing the testimony of surrogate witnesses appear in the record. See docket. no. 11-13, p. 9, entry 329.

5

we have been led to understand, Dr. Quinton is unavailable, he is just difficult." Thomas asserted that Dr. Gwin did not participate or review the autopsy in his report, which is particularly difficult for Sixth Amendment rights. He indicated that Dr. Quinton was difficult to get hold of as far as giving his time to come testify, but that this did not satisfy the unavailability requirements for a witness to a forensic report.

The prosecutor, Andrew Weber, argued that Dr. Gwin, as custodian of records, could permit admission of the photographs and the report through a business records or public records exception to the hearsay rule, and that Dr. Gwin could testify to the contents of the report as a reviewing expert. The Court stated that the motion would be taken under advisement.

However, the records show that on July 11, the day prior to the hearing, the Court issued an order denying the defendant's "motion opposing surrogate witness for pathologist testimony." (Docket no. 11-31, p. 24). This motion denied the defense's request to exclude Dr. Gwin but ordered the State to approach the bench prior to calling Dr. Gwin to give the defense the opportunity to object outside the presence of the jury or to voir dire the witness. The record is silent as to why the order denying the motion appears to be dated on the day before the hearing was conducted, nor why - if an order denying the motion had been entered the day before - this was not mentioned at the hearing.

At trial, Dr. Gwin testified that he had come to an opinion based on the report prepared by Dr. Quinton and the photographs presented to him. The prosecutor stated that he believed Dr. Gwin was qualified to testify as an expert, and Thomas took Dr. Gwin on voir dire. After Dr. Gwin acknowledged that he was not present at the time of the autopsy, Thomas objected in the following colloquy:

MR. THOMAS:     Your Honor, I guess I'm going to object based on the fact that the witness here is not the party who actually created the report. He hasn't seen the body. He has no knowledge other than looking at the photographs, and we need more than that.

THE COURT:     Well, let me get this clear. Is your objection regarding his expertise at this point or is your objection that he shouldn't be able to testify -

| | |
|---|---|
| MR. THOMAS: | My objection is - |
| THE COURT: | Regarding the autopsy? |
| MR. THOMAS: | I think he shouldn't be able to testify regarding the autopsy. |
| THE COURT: | Well, he's not yet testified about the autopsy, so I want to - once - once those questions are asked, you may make your objection, and I'll also give you a running objection regarding that. |
| MR. THOMAS: | Thank you, Your Honor. |
| THE COURT: | But your objection is overruled at this point. |

Counsel did not lodge any further objections to Dr. Gwin's testimony. (Docket no. 12-18, pp. 95-96).

In *Wright v. Quarterman*, 470 F.3d 581, 586-87 (5th Cir. 2006), the petitioner Gregory Wright was charged with capital murder. According to the state's theory, Wright was staying in the home of the victim, Donna Vick, in DeSoto, Texas. He was seen with her at a VFW lodge the night before she was killed. At 4:00 a.m. the next morning, Wright and a friend named John Adams drove Vick's car to purchase cocaine from a dealer staying at the home of Llewelyn Mosely. Mosely testified that Wright and Adams arrived at his house on the night of the murder and told him that they had some items from a woman in DeSoto that they wanted to get rid of. Several of these items were later identified as belonging to Vick.

The next day, Adams asked an employee at a video store to call the police because he wanted to turn himself in. Adams took the police to Vick's house and assisted in recovering her car. Vick's body was found on her bed with Wright's bloody fingerprint on the pillowcase. Adams also took the police to a shack where Wright sometimes stayed, where Wright was arrested, and to a knife in a vacant lot which had Vick's blood on it.

At trial, Detective Dan Trippel described a conversation he had with Adams, who did not testify, saying that he had discovered Vick's body after meeting with Adams. On cross-examination, Trippel acknowledged that Adams claimed to own one of the knives used in the murder, and on

7

redirect, Trippel stated that Adams told him that Wright used Adams' knife to stab Vick. Wright's counsel made a hearsay objection, and the prosecution responded that the testimony was admissible under the rule of optional completeness.

On direct appeal, Wright argued that the admission of Trippel's testimony violated Texas evidentiary rules and the Confrontation Clause. The Texas Court of Criminal Appeals determined that the Confrontation Clause argument was waived because counsel's hearsay objection did not alert the trial court to the federal nature of the claim. As a result, when Wright sought federal habeas review, the district court found that his Confrontation Clause claim was procedurally defaulted.

On appeal, the Fifth Circuit observed that federal courts may not grant habeas petitions where the state courts expressly denied the claim based on an adequate and independent state procedural rule, citing *Coleman v. Thompson*, 501 U.S. 722, 720, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The state procedural rule must be "firmly established and regularly followed," and it is the petitioner's burden to show that the procedural bar is not regularly applied or was exorbitantly applied under the circumstances. *Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997); *Lee v. Kenma*, 534 U.S. 362, 376, 122 S.Ct. 887, 151 L.Ed.2d 820 (2002).

Wright argued that his objection based on a Texas state evidentiary rule was sufficient to preserve his Confrontation Clause claim and so the Texas Court of Criminal Appeals' decision was not an adequate procedural bar. The Fifth Circuit rejected this argument, observing that Texas law generally requires a defendant to make a specific Confrontation Clause objection to preserve such an error. The court went on to state that "Texas courts have frequently held, both before and after Wright's trial, that where it is not clear from the context of the trial that the defendant was raising a Confrontation Clause claim, a hearsay objection does not preserve the federal constitutional error." *Wright*, 470 F.3d at 587 (footnotes omitted).

In the present case, the order denying Petitioner's pre-trial challenge to the testimony of a surrogate witness put the matter off until trial, leaving the door open for counsel to object at that time. At trial, Petitioner did not raise the Confrontation Clause but objected based upon a lack of

personal knowledge. As the state appellate court determined, this is not sufficient to preserve alleged Confrontation Clause error. *Reyna v. State*, 168 S.W.3d 173, 178 (Tex.Crim.App. 2005) (where an objection encompasses complaints under both the Texas Rules of Evidence and the Confrontation Clause, the objection is not sufficiently specific to preserve error); *Cantu v. State*, 939 S.W.3d 627, 634 (Tex.Crim.App. 1997) (objection stating that "we object to the out of court statements of these co-defendants that we can't confront and cross-examine," followed by a request for "a running objection to all these hearsay statements" was not sufficiently specific to preserve review on appeal). Because Petitioner did not properly preserve his Confrontation Clause objection, he procedurally defaulted this claim for purposes of federal habeas corpus review. *Wright*, 470 F.3d at 588.[2]

Nor has Petitioner shown cause and prejudice sufficient to overcome the procedural default. The Supreme Court has explained that to overcome a procedural default, the petitioner must demonstrate cause to excuse the procedural defect and actual prejudice as a result of the alleged violation of federal law, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Shinn v. Ramirez*, 596 U.S. 366, 371, 142 S.Ct. 1718, 212 L.Ed.2d 713 (2022). The "fundamental miscarriage of justice" exception refers to the conviction of a person who is

---

[2]The opinion of the Twelfth Judicial District Court of Appeals was the last reasoned opinion issued by the state courts on this issue; his petition for discretionary review was refused without a written order on September 22, 2021, and his petition for the writ of habeas corpus was denied without written order on January 19, 2022.

The Supreme Court has explained that when the final state court to decide the issue is not accompanied by reasons, the federal court looks through the unexplained decision to the last related state court decision which provides a relevant rationale. *Id.* The federal court then presumes that the unexplained decision adopted the same reasoning. *See also Ylst v. Nunnemaker*, 501 U.S. 797, 799-800, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). Nonetheless, the federal court only reviews the reasonableness of the state court's ultimate decision, not the written opinion explaining that decision. *Russell v. Denmark*, 68 F.4th 252, 262 (5th Cir. 2023). Thus, in reviewing a state court opinion, the federal habeas court focuses on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence. *Id., citing Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).

actually innocent. *Schlup v. Delo*, 513 U.S. 298, 314-15, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Petitioner has failed to show cause and prejudice nor actual innocence, and thus has not demonstrated a basis upon which to excuse the procedural default.

Even were Petitioner's Confrontation Clause claim not procedurally defaulted, this claim would fail on the merits. The Confrontation Clause provides that the State may not introduce a testimonial hearsay statement unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant. *Bullcoming v. New Mexico*, 564 U.S. 647, 657, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). The Court will assume that the autopsy report is a testimonial statement; however, any expert opinions expressed by Dr. Gwin based upon his own review of the autopsy report are admissible. *See, e.g.*, *Lee v. Davis*, civil action no. 4:15cv2821, 2016 U.S. Dist. LEXIS 197577, 2016 WL 11643410 (S.D.Tex., May 26, 2016); *Sylve v. Cain*, civil action no. 14-1180, 2014 U.S. Dist. LEXIS 188971, 2014 WL 12521372 (E.D.La., December 15, 2014), *Report adopted at* 2016 U.S. Dist. LEXIS 118739, 2016 WL 4592135 (E.D.La., September 1, 2016).

The Supreme Court has held that Confrontation Clause claims are subject to a harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The Court explained as follows:

> Accordingly, we hold that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to Chapman harmless-error analysis. The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

In the present case, Dr. Gwin testified that according to the autopsy report, Kayla Thompson died from homicide, which he explained meant death at the hands of another person. He reviewed the photographs of Kayla's body and read the description given of the body. Dr. Gwin discussed

each of the multiple stab wounds and stated that there were also numerous blunt force injuries including fractured ribs, a fractured sternum, and abrasions over most of the body. While he testified concerning the cause of death, saying that her injuries would have resulted in death in seconds to minutes - and it was not disputed that Kayla was dead or that she died by homicide - none of Dr. Gwin's testimony implicated Plaintiff in the homicide or stated that Plaintiff, rather than someone else, had caused Kayla's death.

The State argued on direct appeal that the autopsy report, even if inadmissible, was cumulative to Dr. Gwin's permissible expert testimony. The State also maintained that the evidence of the physical state of the victim's body was cumulative to the testimony of the police photographer, the detectives, Kayla's mother, and a neighbor who all saw the body prior to the autopsy being performed.

Kyeleigh Kincaide, Kayla's daughter, testified that she was ten years old at the time of the incident. It was Easter, so she set an alarm to wake up to see if the Easter bunny had come. She woke up during the night and heard Petitioner arguing with Kayla. She heard Kayla say "you hit me in the head, you're going to jail, I think you left a bruise." Petitioner replied that there was no bruise. They continued to argue, so Kyeleigh opened the door and went out, asking if everything was okay. Kayla told her that it was okay and she should go back to sleep.

Kyeleigh stated that she went back in her room and dozed off, but didn't really go back to sleep. Later, she again heard loud noises and yelling, and Kayla started screaming "Kyeleigh." Kayla came into the bedroom and told Kyeleigh to "call her nanny," meaning her grandmother, Kayla's mother. She started entering her password into her phone, but Petitioner came into the room and took her phone away by grabbing her hand and snatching the phone from her. Kayla was screaming for Petitioner to get away from her daughter and not touch her. Kyeleigh stated that it was strange because Petitioner was acting calm while Kayla was screaming and crying.

After Petitioner and Kayla left the bedroom, Kyeleigh stated that her younger brother C.J. woke up and asked if they were fighting, and Kyeleigh told him to be quiet so she could listen. She

could her them arguing, and heard Kayla say that Petitioner was going to jail and to get out of her house.

Kyeleigh said that she heard a thud and believed that her mother was on the ground. She explained that her mother was bigger than Cedric and that it was "a large person thud." She heard Kayla crying and saying "that hurt," and that Kayla was saying "Kyeleigh."

Kyeleigh said that she heard the silverware drawer shake and came out of her room to see Kayla laying in the hallway crying. Petitioner then slammed the door in Kyeleigh's face. Kayla said that Kyeleigh should not have to see this and that she loved her.

At that point, Kyeleigh said that she heard "steps, people running out of the house." After the car took off, she got up and walked out and saw a big puddle of blood in the hallway where Kayla had been laying. She went back into the bedroom where her younger brother was crying and told him to shut up because she was afraid that if they were not quiet, it would happen to them next.

After that, Kyeleigh said she again heard sounds of someone in the house and the front door slamming open, and then a car speeding out of the driveway. She could tell that the car was her mother's Trailblazer. She then heard someone come back to the house, and she could hear Petitioner's voice and noises like rummaging through a closet. A little while after she heard Petitioner return to the house, a latch was put on Kyeleigh's door, locking it. She explained that there were three doors into her room, which led to the living room, Petitioner's room, and the outside; however, the doors to the living room and Petitioner's room were locked, and the door to the outside was blocked off by a bunk bed on the inside and a dryer on the outside.

Kyeleigh said that she told C.J. to be quiet and there was nothing they could do, so to try to go back to sleep. She eventually managed to get back to sleep and woke up the next morning. Another of her younger brothers, Camryn, asked her if the Easter bunny had come, because he did not know what had happened. The children could not get out of the room and had to use the toilet in a Halloween bucket. Kyeleigh kicked out a board next to their air conditioner but she was afraid to go outside.

Eventually, Kyeleigh said that Nanny came and let them out by moving the dryer while the children moved the bunk bed. Nanny told the children that their mother was dead. (Docket no. 12-20, pp. 77-99).

Judith Wood, Kayla's mother, known to the children as Nanny, testified that she received a message saying Petitioner had attempted suicide and was in the hospital. She went out to the house and discovered Kayla's body in the driveway. She let the children out of the bedroom and told them what had happened. (Docket no. 12-20, pp. 34-46). A neighbor named Billy Wilson testified that he heard someone screaming and went out to find Wood standing over Kayla's body. He said that the body was in the center of the tire marks as though someone had turned their tires toward where the victim was. (Docket no. 12-20, pp. 14-15). Sharon Phillips, a friend of Wood's, testified that she was on the phone with Wood when Wood arrived at the house and found Kayla's body, and that she heard Wood screaming and saying "Kayla, wake up." (Docket no. 12-20, p. 27).

A paramedic named James Suggs testified that he was called out to the scene and quickly recognized that Kayla was dead. He documented blunt injury and inappropriate articulation of the torso and lower extremities, possible blunt force trauma at the pelvic area, abdominal distension, crush injuries, laceration, soft tissue swelling, bruising, and generalized multi-system trauma. (Docket no. 12-19, p. 60). Detective J.C. Bonet testified about going to Marshall to get the Trailblazer on a warrant and about the pictures he took showing blood on the outside of the vehicle. (Docket no. 12-19, p. 81). Officer Martin Pepin testified about going out to the scene as lead investigator and discovering that the tire tracks at the scene by Kayla's body matched the tire tracks on the Trailblazer, the vehicle recovered from the Petitioner. (Docket no. 12-19, p. 105). Pepin also testified that he found blood in some sand at the scene, as well as shoe prints which had been made after the blood was already in the sand. The shoe prints matched shoes taken from Petitioner at the hospital. (Docket no. 12-19, pp. 108-111).

A review of the totality of the evidence in light of the factors set out in *Van Arsdall* shows that even had Petitioner made a proper Confrontation Clause objection and the testimony of Dr.

Gwin and the autopsy report been excluded, the State presented more than ample evidence upon which to obtain a conviction. Given the overall strength of the State's case, the admission of Dr. Gwin's testimony and the autopsy report thus could have amounted to no more than harmless error. Petitioner's first ground for relief is without merit as well as being procedurally barred by the failure to make a proper Confrontation Clause objection.

B. Denial of a Speedy Trial

Petitioner states that his case was passed five times between 2014 and 2015. He says that he was found competent to stand trial in September of 2017 and a motion to dismiss was filed, and a hearing was held in April of 2018. He says that the State was negligent in submitting DNA samples to the Department of Public Safety for analysis, indicating that this was the cause of the delay in his trial.

The Respondent asserts that this claim was not raised in Petitioner's petition for discretionary review or his state habeas proceeding and is thus unexhausted. Petitioner concedes in his response that this is correct, and a review of Petitioner's state habeas petition and petition for discretionary review confirms it. *See* docket no. 15-51 (petition for discretionary review), 15-56 and 57 (state habeas petition).

A petitioner must fully exhaust state remedies before seeking federal habeas corpus relief. 28 U.S.C. §2254(b). In order to exhaust state remedies in accordance with §2254, a petitioner must fairly present the factual and legal basis of any claim to the highest available state court for review prior to raising it in federal court. *Nickleson v. Stephens*, 803 F.3d 748, 753 (5th Cir. 2015). In Texas, a prisoner must present his claims to the Texas Court of Criminal Appeals in a petition for discretionary review or an application for the writ of habeas corpus. *Myers v. Collins*, 919 F.2d 1074, 1076 (5th Cir. 1990) (exhaustion may be accomplished in direct appeal through a petition for discretionary review or collaterally in a habeas corpus petition); *Bautista v. McCotter*, 793 F.2d 109, 110 (5th Cir. 1986).

The Fifth Circuit has held that a procedural default occurs when a prisoner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. *Bagwell v. Dretke*, 372 F.3d 748, 755 (5th Cir. 2004).

In this case, Petitioner filed both a petition for discretionary review and a state habeas petition, but did not raise a speedy trial claim in either. Were he to file another state habeas petition raising this claim, it would be dismissed as an abuse of the writ under Tex. Code Crim. Pro. art. 11.07(4). *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997); *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995). Petitioner has not made a showing of cause and prejudice, or a fundamental miscarriage of justice, sufficient to overcome the procedural default. His second claim is procedurally defaulted and should be dismissed.

C. Sudden Passion

Petitioner argues that the offense of murder was not proven at trial because the jury had evidence that Petitioner acted with sudden passion, in that there was evidence that Kayla was having an affair with a person named Benjamin Finley. The Respondent contends that this claim was procedurally defaulted because it was not raised in Petitioner's petition for discretionary review or his state habeas proceeding, and Petitioner concedes that this is correct. This claim is procedurally defaulted and should be dismissed.

D. The Deadly Weapon Finding

Petitioner asserts in his federal habeas petition that the trial judge, Chris Day, removed the finding of a deadly weapon in a *nunc pro tunc* order on July 24, 2019, after the trial, which Petitioner asserts is grounds for an acquittal. He also complains that the State sold the Trailblazer and that counsel failed to move for a dismissal based on the fact that the DNA did not prove murder by Petitioner.

Petitioner's petition for discretionary review raised only a Confrontation Clause claim. His state habeas petition did not raise claims concerning the sale of the Trailblazer or counsel's failure to move for dismissal, so these claims have been procedurally defaulted.

The state habeas petition did argue that the deadly weapon finding was removed by the trial judge in a *nunc pro tunc* order, which Petitioner claimed rendered his murder conviction unlawful. The judgment originally had for the deadly weapon finding "yes, not a firearm," (docket no. 15-57, p. 7), but the *nunc pro tunc* order changed the deadly weapon finding to "N/A." (Docket no. 15-57, p. 1).

Petitioner maintains in his federal habeas petition that the removal of the deadly weapon finding amounted to a removal of an element of his conviction, which he claims is grounds for acquittal. However, the use of a deadly weapon is not an element of the crime of murder. *Latulas v. State*, slip op. no. 9-18-00313-CR, 2020 WL 2046160 (Tex.App.-Beaumont, April 29, 2020, pet. ref'd); Tex. Penal Code art. 19.02(b). Consequently, the modification of the judgment to show no deadly weapon finding did not affect the elements of Petitioner's offense or the validity of the judgment.

This is confirmed by the fact that the Texas Court of Criminal Appeals has held that a trial judge has the discretion to decline to make a deadly weapon finding even after finding the defendant guilty of an offense in which use of a deadly weapon was a charged or necessary element. *Guthrie-Nail v. State*, 506 S.W.3d 1, 6 (Tex.Crim.App. 2015). Thus, even if a deadly weapon was an element of the offense or charged in the indictment, Judge Day had the discretion to decline to make such a finding without affecting the validity of the judgment.

To the extent that Petitioner contends the deletion of the deadly weapon finding meant there was insufficient evidence to support his conviction, he has failed to exhaust this claim and it is procedurally defaulted. Texas law requires that challenges to the sufficiency of the evidence must be raised on direct appeal and not in a state habeas proceeding. *Renz v. Scott*, 28 F.3d 431, 432 (5th Cir. 1994). Because Petitioner raised this claim for the first time in his state habeas proceeding, and

not on direct appeal, he did not present it to the Texas Court of Criminal Appeals in a procedurally proper manner, rendering it unexhausted and thus procedurally defaulted. *Brown v. Collins*, 937 F.2d 175, 178 (5th Cir. 1991). Plaintiff's claim on this point may be dismissed on this basis as well.

## VI. Conclusion

Title 28 U.S.C. § 2254(d) provides that in order to be granted a writ of habeas corpus in federal court, a petitioner must show that the state court's adjudication of his claim resulted in a decision which was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court, or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).

An "unreasonable" application of federal law is different from an "incorrect" application of federal law. *Renico v. Lett*, 559 U.S. 766, 773, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010). This means that a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly; rather, the decision must be "objectively unreasonable," a standard which creates a substantially higher threshold for obtaining relief than de novo review. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).

The "contrary to" clause of § 2254(d)(1) applies when a state court fails to apply a legal rule announced by the Supreme Court or reaches a result opposite to a previous decision of the Supreme Court on materially indistinguishable facts. The "unreasonable application" clause of § 2254(d)(1) applies when the state court correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case. *Dorsey v. Stephens*, 720 F.3d 309, 314 (5th Cir. 2013), (citations omitted). The AEDPA thus imposes a "highly deferential standard for evaluating state court rulings" and "demands that state court decisions be given the benefit of the doubt." *Renico*, 559 U.S. at 773, 130 S.Ct. 1855 (citations omitted).

In this regard, the Fifth Circuit has explained that "federal habeas review under AEDPA is therefore highly deferential. The question is not whether we, in our independent judgment, believe that the state court reached the wrong result. Rather, we ask only whether the state court's judgment was so obviously incorrect as to be an objectively unreasonable resolution of the claim." *Cardenas v. Stephens*, 820 F.3d 197, 201-02 (5th Cir. 2016). State courts' findings of fact are entitled to a presumption of correctness and a petitioner can only overcome this presumption through clear and convincing evidence. *Reed v. Quarterman*, 504 F.3d 465, 49 (5th Cir. 2007).

Petitioner has failed to show that the state court's adjudication of his claim through the denial of relief in his petition for discretionary review and state habeas corpus petition resulted in a decision which was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court, or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Nor has he shown any basis upon which to consider his procedurally defaulted claims. His petition for habeas corpus relief is without merit.

## Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. §2253(c)(1)(A). A district court may deny a certificate of appealability *sua sponte* because the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

The prerequisite for a certificate of appealability is a substantial showing that the petitioner has been denied a federal right. *Newby v. Johnson*, 81 F.3d 567, 569 (5th Cir. 1996). A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate

to deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

Petitioner has not shown, nor does the record indicate, that jurists of reason could disagree with the district court's resolution of his claims or that the issues presented are adequate to deserve encouragement to proceed further. Consequently, he is not entitled to a certificate of appealability.

## RECOMMENDATION

It is accordingly recommended that the above-styled application for the writ of habeas corpus be dismissed with prejudice. It is further recommended that a certificate of appealability be denied *sua sponte*.

A copy of these findings, conclusions and recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendations must file specific written objections within 14 days after being served with a copy.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's proposed findings, conclusions, and recommendation where the disputed determination is found. An objection which merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific, and the district court need not consider frivolous, conclusive, or general objections. *Battle v. United States Parole Commission*, 834 F.2d 419, 421 (5th Cir. 1987).

Failure to file specific written objections will bar the objecting party from appealing the factual findings and legal conclusions of the Magistrate Judge which are accepted and adopted by the district court except upon grounds of plain error. *Duarte v. City of Lewisville*, 858 F.3d 348, 352 (5th Cir. 2017).

**So ORDERED and SIGNED this 25th day of March, 2024.**

19

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE